GRANVILLE S. OLDFIELD, PLAINTIFF IN ERROR, *v.* WILLIAM H.
MARRIOTT.

The second article of the treaty between the United States and Portugal, made on
the 26th of August, 1840 (8 Stat. at Large, 560), provides as follows, viz.: —
"Vessels of the United States of America arriving, either laden or in ballast, in
the ports of the kingdom of Portugal, and, reciprocally, Portuguese vessels arriv-
ing, either laden or in ballast, in the ports of the United States of America, shall
be treated, on their entrance, during their stay, and at their departure, upon the
same footing as national vessels coming from the same place, with respect to the
duties of tonnage, lighthouse duties, pilotage, port charges, as well as to the fees
and perquisites of public officers, and all other duties and charges, of whatever
kind or denomination, levied upon vessels of commerce, in the name or to the
profit of the government, the local authorities, or any public or private establish-
ment whatever."

This article is confined exclusively to vessels. It does not include cargoes, or make
any provision for an indirect trade, — that is, it does not provide for the introduc-
tion of articles which are the growth, produce, or manufacture of some third coun-
try, into the ports of Portugal in American vessels upon the same terms upon
which they are introduced in Portuguese vessels, or the introduction of such arti-
cles into the ports of the United States in Portuguese vessels upon the same terms
upon which they are introduced in American vessels. These classes of cases are
left open to the legislation of each country.

The Tariff Act of Congress, passed on the 30th of July, 1846, has the following
section: — "Schedule I. (Exempt from duty.) Coffee and tea, when imported di-
rect from the place of their growth or production, in American vessels, or in for-
eign vessels entitled by reciprocal treaties to be exempt from discriminating duties,
tonnage, and other charges."

The treaty with Portugal is not one of those referred to in this paragraph.

Consequently, a cargo of coffee, imported from Rio Janeiro in a Portuguese vessel, was
subject to a duty of twenty per cent., being the duty upon non-enumerated articles.

An historical account given of the course pursued by the government of the United
States, showing that, since the year 1785, it has been constantly endeavoring to
persuade other nations to enter into treaties for the mutual and reciprocal abolition
of discriminating duties upon commerce in the direct and indirect trade.

THIS case was brought up, by writ of error, from the Circuit
Court of the United States for the District of Maryland.

It was an action brought by Oldfield against Marriott, who
was the collector of the port of Baltimore, to recover back the
amount of duties paid under protest upon an importation of
coffee in a Portuguese vessel from Rio Janeiro.

On the 26th of August, 1840, a treaty was made between
the United States and Portugal (8 Stat. at Large, 560), the
second article of which provided that "vessels of the United
States of America arriving, either laden or in ballast, in the
ports of the kingdom of Portugal, and, reciprocally, Portuguese
vessels ariving, either laden or in ballast, in the ports of the
United States of America, shall be treated, on their entrance,
during their stay, and at their departure, upon the same foot-
ing as national vessels coming from the same place, with re-
spect to the duties of tonnage, lighthouse duties, pilotage,
port charges, as well as to the fees and perquisites of public
officers, and all other duties and charges, of whatever kind

or denomination, levied upon vessels of commerce, in the name or to the profit of the government, the local authorities, or any public or private establishment whatever."

. On the 30th of July, 1846, Congress passed " An Act reducing the duty on imports and for other purposes," the third section of which enacted, " that from and after the first day of December next, there shall be levied, collected, and paid on all goods, wares, and merchandise imported from foreign countries, and not specially provided for in this act, a duty of twenty *per centum ad valorem.*"

In the same act of 1846, was the following section : —

" Schedule I. (Exempt from duty.) Coffee and tea, when imported direct from the place of their growth or production, in American vessels, or in foreign vessels entitled by reciprocal treaties to be exempt from discriminating duties, tonnage, and other charges ; coffee, the growth or production of the possessions of the Netherlands, imported from the Netherlands in the same manner."

In the trial of the cause in the Circuit Court, the following statement of facts was agreed to.

## GRANVILLE S. OLDFIELD *v.* WILLIAM H. MARRIOTT, *Collector of the Port of Baltimore.*

It is agreed and admitted, in the above cause, that the brig Sandade Eterna arrived at the port of Baltimore, from Rio Janeiro, in Brazil, with a cargo of coffee, the production and growth of Brazil, on or about the 15th day of November, 1847 ; that the said brig was, at the time of said arrival and importation of said coffee, a regularly documented vessel of the kingdom of Portugal ; that 1,188 bags of the coffee so imported were consigned to the plaintiff in the above cause, who proceeded, on the 16th of the said month of November, to make an entry of the same as if free of duty, and to obtain a permit, agreeably to such entry ; to unload and discharge from said brig the said 1,188 bags of coffee so imported and consigned to him, as appears by the papers herewith filed and marked No. 1 and No. 2.

(Then followed the import entry, the consignee's oath, and the permit.)

. It is further admitted and agreed, that after the said permit had been given to the plaintiff, but before any portion of the said coffee was unloaded from said brig under said permit, and before the permit was delivered or shown to the inspector of customs of the aforesaid port, in whose charge the said vessel had been placed for custody and delivery of her cargo, the said permit was countermanded by the defendant, as collector as

Oldfield *v.* Marriott.

aforesaid, so far as he could legally countermand it, and the aforesaid entry made of the said coffee by the plaintiff as if the same were free of duty refused, so far as the said collector could refuse, and a claim and charge of duty of twenty per cent. *ad valorem* made by the said collector (amounting to $ 2,070.60) against the said coffee, as being due and payable upon the same, under the provisions of Schedule I of the Tariff Act of the United States of the 30th of July, 1846.

It is further admitted and agreed, that the said plaintiff wholly denied the legality of the said claim of duty made as aforesaid by the said collector, and protested against the payment of the same; and that only because of his inability to obtain possession of his said coffee without the payment of the said duty so claimed and demanded, and after filing with the said collector a protest and notice, of which the annexed paper, marked No. 3, is a copy, did the said plaintiff pay to the said collector the aforesaid sum of $ 2,070.60 as a duty upon the said coffee. (Then followed a copy of the protest and notice.)

It is further agreed, that a paper herewith filed, and marked No. 4, is a true copy of the decree of the government of Portugal, of which it purports to be a translation and copy, and that the said decree had been in full force from the time of its date, in all the dominions of the Queen of Portugal, until and after the importation of the aforesaid coffee and payment of the duty herein before mentioned.

### No. 4.  Decree of the Queen of Portugal.

(Copy.)                      " Treasury Department of State.

" Donna Maria, by the grace of God and the constitution of the monarchy Queen of Portugal, &c., &c., make known to all our subjects that the General Cortes have decreed, and we have sanctioned, the following law:—

" Article 1. The premium of fifteen per cent. granted by art. 1 of the decree of 16th January, 1837, to articles, merchandise, and manufactures imported in Portuguese vessels, and entered at the custom-houses of the kingdom and adjacent islands, is abolished.

" Sect. 1. Articles, merchandise, and manufactures, coming from countries or ports where the Portuguese flag is not admitted, imported and entered for consumption, shall pay the respective duties, and one fifth more of the amount of said duties.

" Sect. 2. Articles, merchandise, and manufactures, coming from countries or ports where the Portuguese flag is admitted, and not subjected to differential duties, imported in foreign vessels, not of the country of the production of said articles,

Oldfield v. Marriott.

merchandise, and manufactures, and entered for consumption, shall also pay the respective duties, and one fifth more of the amount of said duties.

" Sect. 3. Articles, merchandise, and manufactures, coming from countries or ports where the Portuguese flag may be subjected to differential duties, imported in foreign vessels, and entered for consumption, shall pay the respective duties, and the additional duties which the government is bound to impose on them according to article 8th of the general tariff of duties, organized in conformity to the law of the 11th of March, 1841.

" Article 2. The provisions of the present law shall commence to take effect three months after its publication, for articles, merchandise, and manufactures which shall be entered in vessels coming from ports in Europe and North America, and six months for all other ports.

" Article 3. All contrary legislation is hereby revoked.

" We therefore order all authorities, &c.

" Given at the Palace of Necessidades, the 18th of October, 1841.

.." THE QUEEN.

" ANTONIO JOSE D'AVILA,
          *Secretary of the Treasury.*"

### *Article 8th of the General Tariff Law referred to.*

" A special order of the government shall authorize the collectors to receive an additional duty on goods imported from foreign countries, equivalent to the difference of duties which said nations shall make between their national vessels and those of Portugal, or between Portuguese goods on their importation."

(And the said decree regulated and controlled within the kingdom of Portugal the indirect trade between the United States of America and the kingdom of Portugal at the time of the said importation and demand and payment of said duties; and that, under said decree, coffee and other articles of merchandise the production and growth of Brazil, and imported into any port of the kingdom of Portugal in vessels of the said United States, were subjected in said kingdom, by virtue of said decree, to the payment of a discriminating duty of twenty per cent. upon the amount of duty payable upon the same articles if imported into the kingdom of Portugal in a Portuguese vessel.)

It is agreed that the facts herein stated may be modified and added to in such way as may be thought proper and necessary by the court for a full and correct presentation and decision of the issue in the cause.

13 *

It is also admitted that the said decree of Portugal is executed in like manner, in reference to all foreign vessels and their cargoes, as in reference to those of the United States.

It is also admitted, that, since the passage of the Tariff Act of 1846, several Portuguese vessels have arrived from Rio de Janeiro, in ports of the United States, with cargoes of coffee the growth of Brazil; that such coffee was admitted free of duty, the Secretary of the Treasury not having been consulted in reference thereto, and having given no directions about the same.

It is further agreed that the court shall render a judgment, upon this statement, for the plaintiff or for the defendant, according to the views which the court may take of the law of the case; and that either party may prosecute a writ of error from whatsoever judgment may be rendered by the court in this case.

> GEO. M. GILL, *for Plaintiff.*
> W. L. MARSHALL, *for Defendant.*

Upon this statement of facts the Circuit Court gave judgment for the defendant. Whereupon, Oldfield brought the case up to this court.

It was argued by *Mr. Gill* and *Mr. David Stewart,* for the plaintiff in error, and by *Mr. Crittenden,* Attorney-General, for the defendant in error.

The counsel for the plaintiff in error contended, —

First. That upon the true construction of the act of 1846, in connection with the treaty with Portugal, the coffee imported by appellant was free from duty, it having been imported from its place of growth to this country in a Portuguese vessel, which, under the treaty with Portugal, is exempt from discriminating duties, tonnage, and other charges.

Second. That in the construction of the act of 1846, each word used is to have its usual and ordinary meaning; and while effect is to be given to each word, the whole sentence is to be governed by grammatical rules. Respect is also to be had to the order and relation between themselves of the words employed, and such interprctation is to be given as will elucidate the meaning of the whole sentence, and yet give effect, if possible, to each word thereof. If, upon applying the above rules of construction, the meaning of the whole is clear and apparent, then there will be no necessity to look beyond the context. In this case, it is contended that, upon the application of the above principles, the meaning of the law is clear and without ambiguity; and that all coffee imported into this

country from the place of its growth, in American vessels, or in foreign vessels which, under reciprocal treaties, are exempt from discriminating duties; tonnage, and other charges, is free.

Third. That revenue laws are, in no just sense, either remedial laws or founded upon permanent public policy, and are, therefore, not to be liberally construed. Nor is it necessary or proper to look beyond the context of the law to ascertain its meaning or intent, which ought to be gathered from the law itself. In support of this view, the appellant relied upon the case of The United States v. Wigglesworth, 2 Story, 370.

Fourth. That if, in ascertaining the construction of the act of 1846, reference be had to acts *in pari materia*, the necessity of which in this case is not admitted, the appellant relied upon the following acts. Act of 27th April, 1816, § 3 (3 Stat. at Large, 313) ; Act of 22d May, 1824, § 2 (4 Stat. at Large, 29) ; Act of 14th July, 1832, § 10 (Ibid. 592) ; Act of 30th August, 1842, §§ 9, 10 (5 Stat. at Large, 561).

These various acts of Congress all contain a similar provision, by which an additional duty of ten per cent. is imposed upon goods imported in foreign vessels beyond that imposed on the same goods imported in American vessels, unless the said goods are entitled, by treaty or act of Congress, to be imported in such foreign vessels on payment of the same duties as they would be if imported in the vessels of the United States. In all these cases the exemption from the additional duty refers in express terms to the goods themselves. In the case under consideration, the exemption has reference to the vessels, and not to the goods. The difference in the mode of expressing these exemptions was relied on as showing that, in the act of 1846, the exemption from discriminating duties has reference to the vessel, and not to the cargo ; and it was contended that other and different language would have been used in the act of 1846, if the policy of the previous acts of 1816, 1824, 1832, and 1842 had been designed to be continued in that act.

Fifth. The appellant, in considering acts *in pari materia*, further contended, that the acts of 7th January, 1824 (4 Stat. at Large, 4), and of 31st May, 1830 (Ibid. 425), were general laws to regulate the duties of tonnage and impost; and, being such, were founded upon views of reciprocity, and were intended to repeal discriminating duties on vessels of foreign nations only where the nations to which these vessels belonged had no discriminating duties against our vessels ; and that the same principle is applied to cargoes in foreign vessels.

The law of the 7th of January, 1824, in the first place, refers

to a discriminating duty on tonnage ; and in the second place, to a discriminating duty on goods. Now, if the framer of the act of 1846 meant to continue the same policy in that law as that contained in the laws of 1824 and 1830, the same or similar language would have been used, and the same distinction would have been drawn, which have not been done ; and hence the appellant contended that the same policy has not, in fact, been pursued, and was not intended to be pursued. In this view, the appellant relied upon the act of 14th July, 1832, the third section of which provides that coffee shall be free from duty. Under this last law, coffee, no matter whence imported, or in what vessels, is free from duty.

Sixth. The appellant also contended, that the true object and policy of the law of 1846 was to reduce the cost of tea and coffee to the consumer in the United States. Hence, these articles are to be free from duty only if imported from their place of growth ; and, secondly, to enjoy this privilege, these articles must be imported either in American vessels, or in foreign vessels the charges of which in our ports are not greater than those of American vessels. This policy may be illustrated by the act of 1832, which, as shown, admits all coffee, no matter whence imported, or in what vessels, free, and that of 1842, which admits tea and coffee free only when imported from the place of their growth, and in American vessels. Now, the act of 1846 was framed upon the idea that, by admitting these articles as free when imported from their place of growth, and in vessels which might transport them at the lowest freight the object of reduction of price would be most certainly accomplished.

Seventh. The appellant contended that laws imposing duties are never construed beyond the natural import of the language used, and duties are never imposed upon the citizens upon doubtful interpretations. If a doubt, therefore, exist in this case, the appellant is entitled to the benefit of that doubt, and the duty in question is not to be imposed. In support of this view, he relied upon the cases of Adams *v.* Bancroft, 3 Sumner, 384 ; United States *v.* Wigglesworth, 2 Story, 370.

Eighth. The appellant further contended, that it is a general rule, in the interpretation of statutes levying taxes or duties, not to extend their provisions by implication beyond the clear import of the language used, or to enlarge their operation so as to embrace matters not specifically pointed out, although standing upon a close analogy. He referred, in support of this view, to Dwarris on Statutes, 749, found in 9 Law Library, 76 ; to 9 Pickering, 412 ; and to the authorities in Sumner and Story already referred to.

The counsel for the plaintiff also cited the following author-
ities. 1 Kent's Commentaries, 462, 5th edition; 20 Wendell,
561; 4 Dallas, 30; 4 Gill, 332; 4 Meeson & Welsby, 195;
7 Meeson & Welsby, 202; 10 Meeson & Welsby, 389, 434,
719; Dwarris on Statutes, 707, 708, 743, 749; 3 Kelly (Ga.),
146; 9 Port. (Ala.), 266; 3 Sumner, 384; 4 Wheaton, 202.

*Mr. Crittenden*, Attorney-General, for the defendant in error,
contended, —

I. Exemption of American vessels, in the ports of Portugal,
from discriminating duties of tonnage, lighthouse duties, and
port charges upon the hulls of the vessels, whilst the discrim-
inating duties upon the cargoes remain to be collected and
paid, does not satisfy the sense and policy of the statutes of
the United States, nor the true meaning and reason of the
Schedule I, for exempting from discriminating duties the for-
eign goods imported in foreign vessels into the ports of the
United States.

II. It is a known rule of interpretation of all instruments,
that such construction be made upon the whole, as that no
clause, sentence, or word shall prove superfluous, void, or in-
significant, if by any interpretation it may be rendered useful
and pertinent. 4 Bac. Abr., *Statutes*, I. § 9, p. 645; Butler *v.*
Duncomb, 1 P. Wms. 457; Touchstone, chap. 5, p. 87; 19
Vin. Abr., *Statutes*, E. 6, pl. 160, p. 528.

III. Another rule for the interpretatió . of statutes is, that
the words must be understood as having regard to the subject-
matter, " sermones semper accipiendi sunt secundum subjectam
materiam." The legislator is always supposed to have that in
his eye, and to have directed all his expressions to the subject,
occasion, and end which caused him to speak and to enact the
law. 1 Black. Comm., Introduction, pp. 60, 61.

IV. It is an established rule of construction of statutes, to
compare one statute with other statutes that are made by the
same legislature, " that have some affinity with the subject, or
that expressly relate to the point."

" All acts *in pari materia* are to be taken together as if they
were one law." Ailesbury *v.* Pattison, Doug. 30; The King
*v.* Mason, 2 T. R. 586; 1 Tucker's Black. Comm., p. 60, note 8.

" If divers statutes relate to the same thing, they ought all
to be taken into consideration in construing any one of them;
notwithstanding some of them may be expired, or are not re-
ferred to in the statute, they must all be taken as one system,
and construed consistently." Rex *v.* Loxdale and others,
1 Bur. 447; 4 Bac. Abr., *Statute*, I. 3, pl. 21 to 28, pp. 64 to
67 (edition by Dodd, Vol. VII. pp. 454, 455).

Blackstone has given two examples, his annotator one, and Bacon four, with the citations of the adjudged cases, from which he has extracted the substance of each case; to which the counsel for defendant respectfully refers the court.

*Mr. Crittenden* then proceeded, under these authorities, to show, by reference to former statutes, that the expressions in the act of 1846 — viz.: " Schedule I. (Exempt from duty.) Coffee and tea when imported direct from the place of their growth or production, in foreign vessels, entitled by reciprocal treaties to be exempt from discriminating duties, tonnage, and other charges; coffee the production of the possessions of the Netherlands, imported from the Netherlands in the same manner," — have relation to a system of discriminating duties for the protection of the ship-building, ship-owning, navigating, and commercial interests of the citizens of the United States; that the expressions quoted from the act of 1846 have a well-defined meaning explained by previous acts, a sense understood at home and abroad, as belonging to the public policy of the United States for countervailing, by discriminating duties, the policy of foreign nations injurious to the commerce of the United States; that this system of countervailing duties, this public policy of the United States, is not satisfied and fulfilled by the repeal to be made by a foreign nation of the discriminating duties of tonnage and port charges on the hulls of vessels of the United States arriving in the ports of that foreign nation, whilst the discriminating duty on merchandise remains; that the reciprocity required by the United States from a foreign nation, to exempt foreign *merchandise* from our discriminating duties on *merchandise* imported into the United States in foreign vessels, is, and must include, an exemption from the discriminating duty on merchandise when conveyed in American vessels into the ports of such foreign nation.

He cited and commented on, — The Act of Congress of 3d March, 1815 (3 Stat. at Large, 224). The Convention between the United States and Great Britain, ratified 22d December, 1815 (8 Stat. at Large, 228). The Act of Congress of 1st March, 1816 (3 Stat. at Large, 255), passed in consequence of that Convention. The Act of Congress of 3d March, 1817 (3 Stat. at Large, 377); Act of 20th April, 1818 (3 Stat. at Large, 465). (Both these acts, he said, defined "discriminating duties" to include duties of tonnage on vessels and duties on merchandise composing the cargoes of the vessels.) The Proclamations of President Monroe, found in 3 Stat. at Large, Appendix, No. 3, 4, 5, 6, 7. The Act of Congress of April 20th, 1818 (3 Stat. at Large, 464). The Act of 3d March, 1819 (3 Stat. at Large, 510). The Act of 7th January, 1824

(4 Stat. at Large, 2). (In this act the term "reciprocal exemption" is used and explained to mean duties on goods and tonnage duties also.) The Act of May 24th, 1828 (4 Stat. at Large, 308). The Proclamations issued by the President under this act, found in 4ª Stat. at Large, Appendix, pages 814, 815, 816, 817. The Act of Congress of 31st May, 1830 (4 Stat. at Large, 425). The act of 13th July 1832 (4 Stat. at Large, 578).

Since these two acts of 31st May, 1830, and 13th July, 1832, took effect, an exemption by one nation of the vessels of the United States from the duty of tonnage may gain for the vessels of that nation a reciprocal exemption from the duty of tonnage in the ports of the United States. But neither before nor since those acts can an exemption from the discriminating duties of tonnage alone, allowed by a nation to vessels of the United States, gain for that nation an exemption from the discriminating duties imposed by the laws of the United States upon goods imported into the United States in foreign vessels. Such an unequal exemption would be in direct contravention of the established policy of the United States, adopted for the purpose of countervailing the policy of foreign nations prejudicial to the commerce of the United States.

The act of 3d August, 1846, passed in consequence of the treaty of 19th January, 1839, between the United States and King of the Netherlands (8 Stat. at Large, 524).

*Mr. Crittenden* then said, — In the series of legislative acts, treaties, and proclamations, under the powers conferred upon the President, I have not found a single instance in which the United States have released or abolished, in favor of any nation, or proposed to release or abolish, the discriminating duties upon goods imported into the United States in foreign vessels, without a reciprocal release or exemption, by such foreign nation, of the discriminating duties upon the vessels of the United States, and upon their cargoes also, in the ports of such foreign nation.

An exemption from the foreign discriminating duties of tonnage might obtain a reciprocal exemption from the discriminating duties of tonnage in the ports of the United States; but nothing short of an exemption from the foreign discriminating duties, both of tonnage and impost, upon the cargoes, could gain for a foreign nation an exemption from the discriminating duties upon goods, wares, and merchandise imported in foreign vessels into the ports of the United States.

In opposition to the positions taken by the counsel for the plaintiff in error, and the authorities cited in support of them, *Mr. Crittenden* referred to the following.

The revenue laws are not to be construed with great strict-ness, like penal laws, "but so as most effectually to accomplish the intention of the legislature in passing them." Taylor *v.* United States, 3 Howard, 210.

"Statutes which concern the public good ought to be construed liberally." "A statute made *pro bono publico* shall be construed in such manner as that it may, as far as possible, attain the end proposed." Bac. Abr. *Statute*, I. pl. 68, 69, 73, 84, 85, 86, Vol. IV. pp. 650, 652; 19 Viner, *Statutes*, E. 6, pl. 49, 50, p. 516; 5 Comyn's Digest, *Parliament*, R. 10, pl. 15, 17, 18, 19, 28, pp. 337, 338, 340; Taylor *v.* United States, 3 Howard, 210.

"Statutes must be so construed as that no collateral prejudice grow thereby." "In statutes, incidents are always supplied by intendment." 2 Inst., 112 and 222; 19 Viner, *Statutes*, E. 6, pl. 145, 146, p. 527.

"A thing which is within the intenion of the makers of the statute is as much within the statute as if it were within the letter." 4 Bac. Abr., *Statute*, I. pl. 42, p. 648; 19 Viner, *Statutes*, E. 6, pl. 80, 81, p. 519; Mountjoy's case, 5 Co., 1 resolve, p. 5; Beawfage's case, 10. Co. 101; Stowell *v.* Zouch, Plowd. 366.

"It is not the words of the law, but the internal sense of it, that makes the law; the letter of the law is the body of the law, and the sense and reason of the law is the soul of the law, — *quia ratio legis, est anima, legis.*"

"And the law may be resembled to a nut, which has a shell and a kernel within; the letter of the law represents the shell, and the sense of it the kernel; and as you will be no better for the nut if you make use only of the shell, so you will receive no benefits by the law if you rely only upon the letter." Eyston *v.* Studd, Plowd. 465.

The argument for the plaintiff, that "the exemption has reference to the vessels, and not to the goods," sticks in the letter, disregards the meaning and reason of the law, makes use only of the shell, and tastes not of the kernel, — the substance and intention of the law. As it is the foreign character of the ships which subjects their cargoes to the discriminating duties, so the exemption from such duties must be communicated by the ships to their cargoes through the instrumentality of a treaty (or other equivalent act) of the nation to which the ships belong, in extending a reciprocal exemption in her ports to the ships of the United States and their cargoes.

A reciprocal exemption from discriminating duties of tonnage and port charges only, omitting the reciprocal exemption from the discriminating duties upon goods, wares, and mer-

chandise, did not entitle the Portuguese vessel Sandade Eterna to an entry and permit to her master to unload her cargo of coffee exempt from the duty levied by the third section of the act of 1846, operating as a discriminating duty between the cargoes of American vessels and of foreign vessels, according to Schedule I of the act.

Mr. Justice WAYNE delivered the opinion of the court.

This cause was tried and decided in the Circuit Court, upon a statement of facts made by the parties.

The question arising from it is, whether or not the vessels of Portugal are within that clause of the act of the 30th of July, 1846, to reduce duties on imports, in which it is said coffee and tea are exempt from duty when imported direct from the place of their growth or production in American vessels, or in foreign vessels entitled by reciprocal treaties to be exempt from discriminating duties, tonnage, and other charges.

It is contended that Portuguese vessels are within the act, upon a proper construction of it in connection with the second article of the treaty with Portugal.

This article is in these words:—"Vessels of the United States of America arriving, either laden or in ballast, in the ports of the kingdom and possessions of Portugal, and, reciprocally, Portuguese vessels arriving, either laden or in ballast, in the ports of the United States of America, shall be treated on their entrance, during their stay, and at their departure, upon the same footing as national vessels coming from the same place, with respect to the duties of tonnage, lighthouse duties, pilotage, port charges, as well as to the fees of public officers, and all other duties and charges, of whatever kind or denomination, levied upon vessels of commerce in the name or to the profit of the government, the local authorities, or of any public or private establishment whatever." Its meaning is, that there shall be an entire reciprocity of duties and charges upon the vessels of the two nations in their respective ports; that is, that Portuguese vessels in our ports shall pay no other charges than American vessels do, and that American vessels in Portuguese ports shall be charged with the same duties as Portuguese vessels may be liable to pay. What these duties may be shall be determined by each nation for its own ports.

There is not a word in the article relating to the duties upon the cargoes of the vessels of either nation. Nor is there a provision in the treaty,—as we shall show there is in other treaties between the United States and other nations,—restricting either nation from levying discriminating duties upon cargoes carried by the vessels of either into the ports of the other,

when they are made up of articles, merchandise, or manufactures the growth or production of a different nation than that to which the vessel carrying it belongs, or when the cargo shall not be the production either of Portugal or of the United States.

This is the view which both nations have taken of the second article, and of the other parts of the treaty relating to the cargoes of vessels.

The Queen of Portugal, in October, 1841, in less than six months after the ratification of the treaty had been proclaimed by the United States, promulgated a decree of the general Cortes, imposing a discriminating duty upon goods imported in foreign vessels which were not the production of the countries to which such vessels might belong. The object of it was to secure to Portuguese vessels the direct carrying-trade of such merchandise to the ports of Portugal.

The United States did the same by the eleventh section of the act of the 30th August, 1842, two years after the treaty was made. It placed an additional duty of ten per centum above the rates of duty fixed in the act; "upon goods, on the importation of which, in American or foreign vessels, a specific discrimination between them is not made in the act, which shall be imported *in ships not of the United States.*"

This legislation was acted upon by both nations without any complaint, or even suggestion, that it was not in conformity with the treaty stipulations between them. It shows that the views of both were that the vessels of both were to pey in their respective ports the charges their own vessels were subjected to, and no more, and that the duties upon goods, not of American or Portuguese production, imported into the ports of either nation by the vessels of the other, might be made liable to such discriminating duties as either might think would give to their own vessels the direct trade of such articles.

We will now show that this practice of both nations was exactly what the treaty itself had provided for between them.

The third, fourth, fifth, and sixth articles of the treaty relate to the introduction of merchandise into the two countries, and are all that do so. The seventh and eighth exclude from the operation of those before them the coastwise trade of both nations, and the ports and countries in the kingdom and possession of Portugal where foreign commerce and navigation were not admitted. And the thirteenth article is a mutual undertaking, if either nation shall grant to any other nation a particular favor in navigation or commerce, that it shall become common to the other party, upon the same terms upon which the grant may be made. The third article provides that the

productions of either nation shall be admitted into their re-
spective ports upon payment of the same duty as would be
payable on the same merchandise if it were the growth of
any other foreign. country.   No prohibition can be put upon
the importation or exportation of the produce of either nation
which shall not extend to all other foreign nations; nor shall
there be any higher or other duty in either country, upon the
exportation of articles to either from the other, than is put.
upon the like articles exported to any other foreign country.
As yet nothing has been said about the transportation of
commodities from one nation to the other, or from foreign
states.   That is provided for in the fourth, fifth, and sixth arti-
cles.   By the fourth, both nations can carry in their vessels
the productions of each into the ports of the other upon the
same terms, — the produce and manufactures of Portugal and
the United States, it must be remembered, not the produce
or manufactures of any foreign country; for the stipulation in
the fifth article in respect to the transportation of these per-
mits it to be done only whenever there may be lawfully im-
ported into any or all of the ports of either nation, in vessels
of any foreign country, articles which are the growth, prod-
uce, or manufacture of a country other than that to which
the importing vessel shall belong.   By the sixth article, the
vessels of both nations may export and re-export from the
ports of each all kinds of merchandise which can be lawfully
exported or re-exported from the ports of either, without paying
higher or other duties or charges than the same articles pay
when exported or re-exported in the vessels of either nation.

From all this it must be seen that neither nation has a right
by the treaty to carry in its vessels to the ports of the other
the produce of foreign countries, except upon the payment of
such duties, discriminating and otherwise, as each nation may
impose.

So stood both nations under the treaty from the time of its
ratification, and under their respective legislation afterwards
relating to duties upon cargoes of foreign produce, without any
misapprehension by either, or by the merchants of either, of
the privileges of commerce conferred by the treaty.   Indeed,
there could have been none.   But it was necessary to state
particularly what our treaty stipulations are, that the nature
of the claim now made for her vessels may be more fully

It is now said, that that which the treaty does not permit
the vessels of Portugal to do, our own legislation allows, in that
part of the act of 1846, to reduce duties on imports, which ex-
empts coffee from any duty.

There was such a misapprehension for some time. It was acted upon, too, for several months, by some of our merchants and collectors, — perhaps until corrected in this instance. The error arose from a misapplication of the act to the treaties which we had with nations abolishing discriminating duties of tonnage and port charges, *instead* of confining it to our treaties with those of them in which the same thing had been done, with the additional reciprocity, permitting our vessels and theirs to import into the ports of either, on payment of the same duties, the productions of other foreign countries, whether they are shipped from the country in which they are produced, or from any other foreign country.

When the act of July 30, 1846, was passed, we had commercial treaties with twenty-four nations. Thirteen of them — Russia, Austria, Prussia, Sweden, Denmark, Hanover, Sardinia, the Hanseatic cities, Greece, Venezuela, Brazil, Central America, and Ecuador — "had acceded to the most liberal and extended basis of maritime and commercial reciprocity."

They admit our vessels to enter their ports, whether coming from the United States or any other foreign country, laden or in ballast, — whether laden with the produce of the United States or of any other foreign country, — paying the same tonnage duties and charges as national vessels. Our vessels may clear from their ports, either for the United States or for any foreign country, whether laden or in ballast, — whether laden with national or any other produce. They admit the produce of the United States to entry, either for consumption or for re-exportation, on payment of the same duties and charges as similar articles the produce of any other foreign country pay, whether imported in American or national vessels; and the productions of other foreign countries, likewise, on payment of the same duties and charges, whether imported in American or national vessels, and whether coming from the United States, the country of production, or any other foreign country. When re-exported, the productions of the United States are allowed the same drawbacks as similar productions of other countries, whether originally imported in American or national vessels; and other goods are allowed the same bounties, whether exported in American or national vessels. (Senate Report 80, 26th Congress, 1st Session.) These provisions give to us and to them a direct and indirect carrying trade. Each nation gets as much of both as its ability and enterprise can secure, and gathers a supply of the produce of other nations by foreign vessels, which they may not be able to bring in their own.

Between the treaties of which we have been just speaking

and our treaty with Portugal there is nothing in common, except the provision in the latter abolishing discriminating duties of tonnage and all other port charges upon vessels. In the negotiation of our treaty with her, our Chargé d'Affaires, Mr. Kavanagh, was instructed to offer and to ask for the same enlarged intercourse which we had with these nations. But Portugal preferred to keep the direct trade, placing herself with those nations which had denied to us the indirect trade, or the transportation of foreign produce in our vessels from the place of its growth to their ports.

Having shown that there are nations which have a right by treaties to bring into our ports in their vessels the produce of foreign nations, from the places of their production, upon the same terms that our own vessels may import them, the act exempting coffee from duty when brought in American vessels direct from the place of its growth, or when brought by foreign vessels entitled by reciprocal treaties to be exempt from discriminating duties, tonnage, and other charges, has a plain intention and certain application. Its terms are no longer doubtful. No room is left for interpretation. The nations to which it applies are known. It would, indeed, be a very wide construction to include other nations under the act, with which the United States have no such reciprocity either by mutual legislation or by treaties. If a different application of the act is made, it opens a trade to our ports in the article of coffee in foreign vessels, which those nations deny to the United States. The act itself shows a careful consideration of our carrying trade of that article. Reciprocity is what the United States had desired in that particular. It cannot be supposed that Congress meant to disregard it, or that it was inadvertently done, or that, for some unavowed and undiscoverable cause or reason, Congress has permitted foreign vessels to bring into our ports, from the place of its growth or manufacture, merchandise duty free, only because we have treaties with the nations to which they belong abolishing duties of tonnage and port charges. Such an interpretation of the act of July, 1846, involves a departure from a point in our commercial system which has never been yielded to any nation, except when reciprocally done, or where a compensating advantage has been gained by doing so, which was supposed to be the case in our treaty with France of 1822. With Portugal there was no such inducement. The plaintiff in error relies upon the second article of the treaty with Portugal in connection with the tariff act of July, 1846, and upon nothing else. They do not avail for his purpose. The suggestion that such an interpretation may be given to the act, because it might have been the inten-

14 *

tion to give the consumption of coffee duty free to the people of the United States, is not at all probable. It surrenders a principle more important, — one upon which the United States have invariably acted, — not to grant an indirect trade to our ports to any nation by which it is not reciprocated.

Our conclusion in this case affirms what has been the unvarying policy of the United States since they began as a nation their commercial intercourse with other nations. Its effects upon our own interests have been beneficial; its influence upon other nations has been ultimately decisive and successful.

Perhaps it is not too much to say, — however much the changed political and productive condition of nations, during the last half-century, may have aided in liberalizing navigation between them, — that it would not have been what it now is, if it had not been for the stand taken by the United States, in respect to navigation and commerce, as early as 1785, which has been kept ever since. Its basis was to ask for no exclusive privileges and to grant none, — to offer to all nations, and to ask from them, that entire reciprocity of navigation which is made by each carrying to the other, in its own vessels, its own productions and those of all nations, without regard to the places from which they may be shipped, upon the same terms, both as to vessels and cargoes, as the vessels of each nation may take them to its own ports. One great object has been to produce such relations, either by corresponding legislation or by treaties; the latter being preferred, as legislative liberty to trade is too vague and uncertain to secure to a nation all the advantages of its own commercial condition. Thirty years, however, passed, before our proposals made any impression upon the restricted navigation system of Europe, and then only partially so. During all that time our vessels could only take to the countries with which we traded the productions of the United States. Even that could not be done to many of the ports and colonies of other nations. Repeated efforts were made to get for our vessels a larger carrying trade, by offers to all nations of the same reciprocity.

It may be said, as it has been, that our liberal views were forced upon the United States, by the necessities of their commercial condition at the close of the Revolutionary war. It may be so; but the remark admits the restraints that were upon navigation between nations, and it cannot be denied that the application of them to the United States brought its appropriate wisdom.

Our views upon commerce and navigation were a part and parcel of the intellect and spirit of our men of that day, —

made what they were by the great events in which they had borne their parts, and the difficulties which they saw were to be overcome before their country would be put upon a commercial equality with other nations. The trade which the States as colonies had been allowed with the other colonies of England was cut off by our separation; that with the mother country was subjected to the rigid exclusions of the third section of the navigation act of Charles II. chap. 12. The English system, too, in respect to navigation, had been adopted by the other nations of Europe, with very slight exceptions, which can scarcely be said to have been relaxations. Heavy duties were laid upon our vessels and their cargoes by all of them. The trade and navigation of the United States with all parts of the world were altogether permissive, — such as each nation chose to allow upon its own terms. Our treaty stipulations at that time with France, the Netherlands, and Sweden were not exceptions of any value. The only benefit from them was, that the commerce and navigation of the United States could not be burdened more than that of any other foreign nation. With Great Britain, Spain, Portugal, and Denmark there was not even that reciprocity. In such a state of things, the United States began their career as a nation. How changed our condition now!

Our views upon commerce were promulgated in the state papers of that day. As early as 1785, Mr. John Adams, then representing the United States in England, proposed a reciprocation of trade in the produce and manufactures of both nations, and in foreign produce in the vessels of each, upon the same terms and duties, upon the vessels and their cargoes, as national vessels might pay. His proposals were rejected, with a refusal to make any commercial treaty with the United States. Mr. Adams says, in a letter to Mr. Jay, dated London, 21st October, 1785, — " This being the state of things, you may depend upon it the commerce of Am .·ica will have no relief at present, nor, in my opinion, ever, until the United States shall have generally passed navigation acts. If this measure is not adopted we shall be derided, and the more we suffer the more will our calamities be laughed at. My most earnest exhortation to the States, then, is, and ought to be, to lose no time in passing such acts." The temper of the times concerning navigation and commerce generally, and towards the United States especially, had been previously shown in Parliament by its rejection of Mr. Pitt's bill " to permit vessels belonging to citizens of the United States to go into the ports of the West India islands, with goods or merchandise of American origin, and to export to the United States any merchandise or goods

whatever, subject only to the same duties and charges as if they had been the property of British natural-born subjects, and had been exported and imported in British vessels." Afterwards American vessels were altogether excluded from the British West Indies, and the staple productions of the United States could not be carried there even in British vessels.

The exhortation of Mr. Adams had been disregarded by most of the States. Some of them adopted his recommendations, but, as others refused to concur, they were unavailing. The statesmen of England knew that it would not be generally done by the States, and thought, rightly too, that, as Congress had not the power by the Articles of Confederation to pass national countervailing restrictions, England might trade with some of the States directly, and through those indirectly with the rest of them, upon her own terms. It was also truly said, in reply to our offers to negotiate, that in a confederacy of States, without plenary power to regulate their trade and navigation conjointly, it would be difficult to make and to exercise treaty commercial arrangements between them. This result awakened the American people to the full extent of their actual and prospective commercial condition. Greater efforts were made to get the States to pass connectively countervailing restrictions. They were urged to do so by every argument which could be drawn from these foreign restraints upon commerce which had already pressed the known enterprise of the American people almost into inaction, — by all that aggravation of commercial distress which would inevitably follow from the legislation of Great Britain in respect to American commerce since 1783, unless it was resisted. The newspaper essays of that day upon the subject will amply compensate a perusal of them. Without such a perusal, and a careful attention to the acts of Parliament preceding that of the 28th George III. ch. 6, in connection with that act, no one can have an historical idea of American commerce, or of those causes which so much lessened the harmony of feeling between the two nations for so many years afterwards ; now no longer felt, and lost in the interest which both have in preserving their present liberal commercial intercourse.

Still the States did not pass countervailing restrictions. On that account more than any other, those conventions were held which happily terminated in the present Constitution of the United States. The first countervailing act under it attracted the attention of the nations of Europe, particularly of the statesmen of Great Britain. The advantages which they had in our former national condition were lost. An English writer says the acts passed by the first Congress that met under the

new form of government, imposing discriminating tonnage duties, did not escape the notice of British statesmen. Their injurious effects upon the navigating interest of Great Britain were at once perceived by them. They saw that American commerce was no longer at the mercy of thirteen distinct legislatures, nor subject to the control of the king and council. As early as September, 1789, therefore, the acts imposing those duties were referred to the lords of the Board of Trade. The same committee was afterwards instructed to consider and report what were the proposals of a commercial nature it would be proper for the government to make to the United States. In January following, the committee made a report upon the subject of American duties, and also upon the general subject of the commercial relations between the two countries. The report was drawn up by Mr. Jenkinson, then Baron Hawkesbury, afterward Lord Liverpool

On the subject of a commercial treaty, especially in respect to navigation, it states, — " After a full consideration of all that has been offered on the subject of navigation, the committee think that there is but one proposition which it would be advisable for the ministers of Great Britain to make on this head to the government of the United States, in a negotiation for a commercial treaty between the two countries; viz. that British ships trading to the ports of the United States should be treated, with respect to the duties upon tonnage and imports, in like manner as the ships of the United States shall be treated in the ports of Great Britain; and also, if Congress should propose, as it certainly will, that this principle of equality should be extended to our colonies and islands, and that the ships of the United States should be there treated as British ships, it should be answered that this demand cannot be admitted even as a subject of negotiation."

These extracts from that report show that the statesmen of Great Britain did not entertain the liberal notions of trade and navigation which then prevailed in the United States. They were brought up under an opposite policy, which had long prevailed, — probably very proper at first, as a war measure, to break up the carrying trade of the Dutch, the great rival of Great Britain; but it had become with most of her writers and public men a fixed principle of the protection which each nation should give to its trade and navigation against the competition of other nations. We do not intend to enter upon that discussion. But in confirmation of those differences of opinion concerning trade and navigation which at that time existed between American and British statesmen, we refer to Lord Sheffield's contemporary strictures on the necessity of inviola-

bly preserving the navigation and colonial system of Great Britain.

Pursuing the point, however, that the stand originally taken by the United States has contributed to the present extended reciprocity of navigation between nations, we remark that the example of England towards the United States had directed the commercial policy of all the other nations of Europe with which the United States then traded. The utmost that could be gained from France, Spain, Portugal, the Netherlands, Denmark, and Sweden was, that our commerce with them should be put upon the footing of the most favored nation. That, however, was very short of what the United States had proposed to Great Britain and the other nations just mentioned.

Those nations, yielding to the commercial supremacy of Great Britain, had not then made an effort to release themselves from it. Nor were they in a condition to do so. In three years afterwards, the intelligence and enterprise of the United States, unsubdued by past failures, induced them to renew their efforts to gain a more extended trade and navigation. Mr. Jefferson, then Secretary of State, made a report to Congress upon the subject. It has the ability of every paper written by him in his long political career. Mr. Forsyth says that it suggested, " First, friendly arrangements with the several nations with whom the restrictions existed, or separate acts of our legislation to counteract these defects. The end proposed to be attained by the first would have been a free commerce of exchange between the different nations in those descriptions of commodities which nature had best fitted each to produce, subject to such modifications as purposes of revenue might render necessary; and it was supposed that its operation would be an exchange of the raw materials then produced in the United States, either for manufactures which had received the last finish of art and industry, or mere luxuries. Failing this, the alternative of statutory prohibitions and countervailing duties and regulations was to be applied." (Report of the Secretary of State to the Senate, 30th December, 1839.) Upon the earlier state papers and newspaper essays already mentioned, — the report of Mr. Jefferson, another by Mr. Hamilton (which preceded it), and the proposals of Mr. Adams in 1785, — we rest our assertion that the United States were in advance of other nations in respect to the principles by which commerce and navigation should be conducted between nations. The refusal of Great Britain to meet our proposals in a corresponding spirit proves it. From what has been said, it must be admitted, also, that, from the beginning, the countervailing commercial legislation of the United States has been strictly

retaliatory. · If further proof of either were wanting, it may be found in the correspondence of Mr. Jay, connected with his negotiation of the treaty of 1794 with Great Britain, and in the treaty itself. As all of us know, the restrictions which were put upon our commerce by that treaty were offensive to the pride as well as the interests of the American people. But being the utmost that England would yield at that time of her own long-established system, it was thought that the exigencies of our commercial condition required its ratification. Results proved it to be so. It did not reciprocate in any way the liberal views of commerce which had been indulged in the United States. But we now know that it was the most that could be got; and history not only relieves Mr. Jay from the complaints of that day, but places his memory far above them.

Notwithstanding the failure of every effort to place our navigation and commerce upon a better footing, nothing was done legislatively by the United States from which it can be said that there was any departure from the liberal policy which had been proposed to other nations. The natural advantages of the United States, the value of our productions, and the wars in Europe aiding the consumption of them, were constantly overcoming foreign exclusions, and kept us forbearing, if not always in good temper. In fact, except discriminating duties upon tonnage in favor of our vessels, to countervail such as all the nations of Europe had imposed in favor of their own ships, — several of them intended to bear particularly upon American commerce, — our legislation was, up to that time, and for twenty years afterwards, exempt from every interference with a free navigation. In 1812, as a war measure, Congress passed an act doubling all duties upon goods imported into the United States, with an additional duty of ten per cent. upon such as might be brought in foreign vessels. The act also increased the duty upon the tonnage of foreign ships one dollar and fifty cents. That it was strictly a war measure is shown by its limitation to the continuance of the war with England.

When the war was at an end, and those in Europe had ceased by the overthrow of Napoleon, the United States took the earliest opportunity to renew their efforts for a more liberal navigation than had been at any time allowed by the nations of Europe with each other, or with the United States.

In March, 1815, Congress declared that the discriminating duties laid by the act of July, 1812, upon foreign ships and their cargoes, were no longer to be levied, when the President should be satisfied that the discriminating and countervailing duties of any foreign nation had been abolished, so far as they operated to the disadvantage of the United States. When

that declaration was made, or shortly after it, our plenipotentiaries, Mr. John Quincy Adams, Mr. Clay, and Mr. Gallatin, were in London, engaged in negotiating the commercial convention of 1815 with England. It is not doubted that the act had its influence upon the result. The convention contains all that the act proposes. It was the first relaxation made by Great Britain of her navigation laws in favor of free navigation, and the first step taken to meet the liberal principles of commercial intercourse which had been proposed to all nations by the United States so early in our history as has been already stated. It secured national treatment for our vessels; equal terms for cargoes, whether imported or exported in United States or English ships; equal import duties on the produce of the United States, as on like articles the produce of other foreign nations. But it still restricted the intercourse between the two nations to the production of either, — in other words, to the direct trade.

Every effort which had been made by the United States, for more than thirty years, to give and to get an indirect trade, had failed. Indeed, the Continental nations were not only unwilling to make any such arrangement, but they refused to accept, as England had done, the terms offered by the act of the 3d of March, 1815. It was then determined to renew the discriminating duties which that act had modified. It was confidently believed, that, by doing so, some of those nations which had disregarded that act would be coerced to accept its terms. It was done in April, 1816; and in January following another act was passed, subjecting foreign vessels coming from any port or place to which the vessels of the United States were not permitted to go and trade, to a duty of two dollars a ton. The act was limited to six months; but in two months afterwards, during the same session, Congress, believing that the indefinite extension of it would effect its object sooner, passed such a law. Within the year, Prussia, the Netherlands, and the Hanse Towns, repealed their discriminating duties upon American vessels in their ports, and their vessels were consequently admitted into the ports of the United States upon corresponding terms.

Much was gained, compared with what had been our carrying trade. Still the great object, to get and to give an indirect trade, had failed. It had been defeated by the refusal of England to relax that clause of the navigation act of Charles II. ch. 12, which prohibited the produce and manufactures of every foreign country from being imported into Great Britain except in British ships, or in such as were the real property of the people of the country or place in which the goods were produced, or

Oldfield v. Marriott.

from which they could only be or were most usually exported. The same principle had been adopted by the Continental nations to protect their own from the superior mercantile marine of England. Its increase, too, of English tonnage and commerce, its influence upon both of the other nations of Europe, and the recollection of its ruinous effects upon the trade of the Dutch, which it was originally meant to crush, had misled the judgment of most European statesmen into the conclusion that it was an essential regulation to protect the navigation of each nation from the competition of others. But the general pacification of 1815 restored the long-suspended commercial intercourse between them, and with it sounder views of trade. It was believed, indeed it had become known, that there were nations in Europe who had become as anxious as the United States were to rid themselves of the restrictions imposed upon their commerce by the English navigation act. They were not, however, in a condition to do so immediately in respect to each other, or unitedly against the supremacy of English navigation. Besides, our overtures to some of them for an indirect trade had not been met with the promptness or decision which had been anticipated. The time was favorable for more efficient legislation by the United States than had been made before. It was a matter of doubt and hesitation with many of our public men what could or should be done in such a crisis. Fortunately, there were those among them who were more decided; and Congress determined to adopt the clause of the English navigation act of which we had always complained, with this proviso, however, that it should not be extended to the vessels of any foreign nation which had not adopted and which should not adopt a similar regulation. The proviso explains the purpose of the act of the 1st March, 1817. Before that was passed, the United States had not had a navigation act. It was not, however, followed for several years by any coincident result. But about that time an incident occurred in the political world, which was destined to change, in a great measure, the commercial intercourse between nations. It was the revolt of the Spanish American provinces from Spain, and the recognition of them by the United States and by England as independent nations. Both were anxious to secure a trade with these new States. The United States sought it upon terms of the most extended reciprocity, both as to vessels and cargoes, — England with more commercial liberality than her usual policy, without, however, yielding that main point of it which prevented foreign vessels from having an indirect trade to her ports. Indeed, so fixed had that exclusion become with the nations of Europe, that France, five years afterwards, would

not relinquish, in her treaty with the United States, her right to impose discriminating duties upon cargoes brought into her ports by foreign vessels.

In 1825, the United States reaped the first fruits of the act of March 1, 1817. Then a treaty was made with Central America, the first known between nations, establishing that reciprocity, in respect to vessels and cargoes, which had been offered forty years before by the United States to other nations, and which had for seven years been tendered by the act of March 1, 1817. That treaty was followed by others. Russia, Austria, Prussia, Denmark, Sweden, Sardinia, Greece, the Hanseatic cities, Hanover, Brazil, Ecuador, and Venezuela made treaties with the United States upon the same principle. The vessels of each of those nations were permitted to carry into the ports of the other, without discriminating duties, the productions of any foreign country, whether they were shipped from the places of production or elsewhere. In other words, the vessels of the United States, under those treaties, carry on with those nations an indirect trade, which they can do in their vessels to our ports. The act of 1817 was slow in producing any arrangement of a like kind with Great Britain. But it has ultimately done so. The original interpretation of it by Mr. Secretary Crawford having been renewed by Mr. Secretary Walker's circular, after an interruption of several years, a negotiation was opened with England upon the subject, which resulted in giving to both nations the full intention and benefit of the act of the 1st March, 1817. Its operation, as we have said, had been suspended for several years, from some official misapprehension of its import, when a case occurred in the Circuit Court of the United States for the Southern District of New York, in which the learned judge who presided gave the first judicial interpretation of the act. Judge Betts in that case reviews the legislative history of the act. The question presented in the case of the Recorder and her cargo was, whether an importation into the port of New York by a British vessel from London of a quantity of silks, the production of the British possessions in India, was prohibited by the first section of the act of 1st March, 1817. The court decided that the word " country " used in the section comprehended the British possessions in India, and that consequently the importation was lawful. The learned judge took occasion also to give his views as to the effect of the proviso in the first section. Upon the publication of the court's opinion, the Secretary of the Treasury availed himself of its authority, in connection with what had been the first interpretation of the act, and issued his circular on the 6th of November, 1847, to the collectors and officers

of the customs, directing them that, " where it is satisfactorily shown that any foreign nation allows American vessels, laden with goods the growth, produce, or manufacture of any country out of the United States, freely to enter and land such merchandise in any of the ports of said country, whether such goods be carried directly from the place of origin, or from the ports of the United States, or from any other country whatsoever, the penalties of the act of the 1st March, 1817, are not to be enforced against the vessels of such nations bringing like goods either from the country of production or from the ports of the country to which the vessels may belong." The opinion of Judge Betts and Secretary Walker's circular led to a negotiation, which terminated in Great Britain passing, in 1849, the statute of 12 and 13 Victoria, ch. 49, and thus accomplished the great purpose of our policy which had been proposed by the United States to the nations of Europe, to England particularly, in 1785, by Mr. Adams. The circular of Mr. Meredith of the 15th October, 1849, shows what that policy was, and why it was issued. We give it at length.

" In consequence of questions submitted by merchants and others, asking, in consideration of the recent alteration of the British navigation laws, on what footing the commercial relations between the United States and Great Britain will be placed on and after the first day of January next, — the day on which the recent act of the British Parliament goes into operation, — the Department deems it expedient at this time to issue the following general instructions for the information of the officers of the customs and others interested.

" First. In consequence of the alterations of the British navigation laws, above referred to, British vessels, from British or other foreign ports, will, under our existing laws, after the first day of January next, be allowed to enter our ports with cargoes of the growth, manufacture, or production of any part of the world.

" Second. Such vessels and their cargoes will be admitted, from and after the date before mentioned, on the same terms as to duties, imposts, and charges, as vessels of the United States and their cargoes."

With such facts to sustain it as have been recited, — and they are all official, — it may very truly be said that the reciprocity of navigation now existing between nations, and particularly between Great Britain and the United States, is in a great degree owing to the perseverance of the United States in proposing and contending for it for more than sixty years. It cannot, therefore, be said, as it has been by more than one foreign writer, that, after the American Colonies had established

their independence, they set about to form a code of navigation laws on the model of those of England. Those writers have mistaken our legislation for our history, without seeking in the latter the causes of the former.

Discriminating duties were never laid by Congress, except they were retaliatory, and for the purpose of coercing other nations to a modification or repeal of their restrictions upon commerce and navigation. The leading point and constantly avowed intention of the United States have been, to produce that reciprocity of trade for the vessels of different nations which had been denied by the nations of Europe for more than two hundred years. It was the American system contradistinguished from the European, — the last now happily no longer so to the extent of its former and long-continued exclusiveness.

The judgment of the Circuit Court is affirmed.

*Note.* — It has been stated that the opinion of Judge Betts and Secretary Walker's circular led to a negotiation, which terminated in Great Britain passing, in 1849, the statute of 12 and 13 Victoria, and thus accomplished the great purpose of our policy, which had been proposed by the United States to the nations of Europe, and to England particularly, by Mr. Adams in 1785. Mr. Walker's circular of November 6th, 1847, restoring the construction given to the act of March 1, 1817, by Mr. Crawford having been cited, the importance of the subject will justify a reference to another official document.

On the 18th of January, 1849, Mr. Buchanan, then Secretary of State, referred to the Secretary of the Treasury a note of the British Chargé, Mr. Crampton, requesting the views of the United States government, as to the effect here of the proposed change of the British navigation laws. In his reply of the 31st January, 1849, to the letter of Mr Buchanan, Mr. Walker, in discussing the subject, made the following remarks.

" The alterations in the navigation laws of Great Britain, contemplated by the printed memorandum accompanying Mr. Crampton's note, if adopted to the extent proposed therein, it is conceived, would remove most of the restrictions and disabilities to which our navigation and commercial interests are at present subjected in their intercourse with Great Britain and her colonies, and if the privileges proposed by the measure to be accorded to her colonies should be exercised in a liberal spirit, all the restrictions and disabilities which have heretofore attended our intercourse with said colonies would be likely to be removed.

" Arbitrary restrictions upon navigation or trade are as ad-

verse to the liberal spirit of our institutions as they are opposed to our true interests. The navigation act of the 1st of March, 1817, was passed with a view to counteract the restrictive policy of other nations, and mainly in reference to that of Great Britain, operating as was alleged to the prejudice of our shipping and trade.

" In pursuance of the construction given to the before-mentioned act of 1817, and its present practical operation, as contained in the accompanying copy of circular instructions issued to the officers of the customs, under date of the 6th of November, 1847, it will be perceived that its provisions are not construed to prohibit any foreign nation from pursuing the *indirect trade* with the United States, provided such nation does not interdict the shipping of the United States from carrying on a similar trade with her ports and possessions. Consequently, should Great Britain remove her restrictions in this particular, *no additional legislation on our part* would be necessary to extend to her shipping the privilege referred to."

This official construction by the Treasury Department of the act of 1st March, 1817, was communicated in February, 1849, by the Secretary of State, to the British Chargé, and by him it was transmitted to his government, by whom, after full deliberation and legal advisement, it was adopted as the true interpretation of the act of 1817. As a consequence, the act of Parliament, before referred to, was submitted as a ministerial measure by the British Cabinet, and became a law early in 1849; upon the express assurance of the ministry that our act of 1817 would thus, *proprio vigore,* be brought into operation, the British act being but an acceptance of the terms of reciprocity in the trade, direct and indirect, between the two countries, tendered by the American Congress in 1817. Mr. Meredith, in his circular, consummated the views of Mr. Crawford, Judge Betts, and Mr. Walker, and put into effect the act of 1817; in this way restoring the original construction of it which had been given by Mr. Crawford, but which had been suspended by a Treasury circular issued by Mr. Forward, on the 6th of July, 1842, upon an opinion given by Mr. Legaré, then Attorney-General, which was overruled by the decision of Judge Betts in the case of the Recorder and her cargo.

Thus, after the lapse of sixty-four years from our first offer, in 1785, and thirty-two years from our second offer, in 1817, Great Britain, in 1849, abandoned her restrictions upon American vessels, and accepted the full reciprocity in the trade, direct and indirect, so long tendered to all nations by the United States.

15 *

## Order.

This cause came on to be heard on the transcript of the record of the Circuit Court of the United States for the District of Maryland, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.